**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Case No:

HOLLY VANLUVEN-MALLOY,

       Plaintiff

v.

CORRECTIONAL MEDICAL GROUP COMPANIES INC;
SOUTHWEST CORRECTIONAL MEDICAL GROUP, INC.;
SOUTHWEST CORRECTIONAL MEDICAL GROUP, LLC;
SOUTHWEST CORRECTIONAL MEDICAL GROUP, PLLC;
COLORADO CORRECTIONAL MEDICAL GROUP, PLLC
BOARD OF COUNTY COMMISSIONERS OF DOUGLAS COUNTY, COLORADO,
DOUGLAS COUNTY, COLORADO SHERIFF'S OFFICE,
DOUGLAS COUNTY SHERIFF, TONY SPURLOCK, in his individual and official capacity;
TIMOTHY G. MOSER, M.D., in his individual and official capacity;
JENNIFER TRIMBLE, RN, in her individual and official capacity;
SOPHIA NIX, LPN, in her individual and official capacity;
NICOLE HORTON, RN, in her individual and official capacity;
JAMIE MILLER, RN, in her individual and official capacity;
SHAURI KRON, LPN, in her individual and official capacity;
SHAUNA SHIPPS, in her individual and official capacity;
GINA BRAIDMAN, PA, in her individual and official capacity;
MELISSA HOSKINS, in her individual and official capacity;
EMILY BARRON, RN, in her individual and official capacity;
JOAN CUNNINGHAM, RN, in her individual and official capacity;
KAYLA SHARPE, in her individual and official capacity;
JENNA WALTER, in her individual and official capacity;
MELODIE DIETER, in her individual and official capacity;
KEITH PENRY, in his individual and official capacity;
CHERITI SELLERS, in her individual and official capacity;
ALECIA CASCIOTTA, in her individual and official capacity;
RENEA BERRY, in her individual and official capacity;
TAMMY GARRETT, PA, in her individual and official capacity;
ARTHUR LANDRY, in his individual and official capacity;
KEVIN LESNIEWCZ, in his individual and official capacity;
JESSICA ISAACS, in her individual and official capacity;
NATALIE MORAVEK, in her individual and official capacity;
STEPHANIE RUSSAK, in her individual and official capacity;

1

NICOLE BECKETT, in her individual and official capacity;
UNIDENTIFIED POD DEPUTIES, in their individual and official capacities;
JENNIFER GLENN, in her individual and official capacity;
UNKNOWN DEFENDANT NURSE INITIALS BR, in her individual and official capacity;
CHERYL JOHNSON, NP, in her individual and official capacity;
JANE DOES 1-10,
and JOHN DOES 1-10,

        Defendants.

---

## COMPLAINT AND JURY DEMAND

---

     Plaintiff, by and through her attorneys, Todd Collins and Marc Tull complains against Defendants and requests a trial by jury as follows:

### I.    <u>INTRODUCTION</u>

    1.    Holly Vanluven-Malloy was a 48-year-old inmate at the Douglas County Detention Center who obviously had multiple serious medical conditions that escalated into a life-threatening condition.

    2.    She was prescribed and taking multiple medications for physical and mental health issues. Most of the medications have a known side effect of constipation. Her prescriptions were common prescriptions that any licensed doctor or nurse should have known the side effects for.

    3.    Plaintiff first reported to jail and medical staff about her constipation in August of 2018. her constipation only worsened through December 15, 2018.

    4.    Jail and medical staff were notified over fifty times of Plaintiff's condition and that it was only worsening.

2

5.      Supervisory staff including doctors and nurses mostly ignored or refused to provide additional treatment upon Plaintiff's requests and pleas for help for her worsening condition.

6.      Medical staff and jail employees deliberately conspired with one another regarding the dismissal and disregard of Plaintiff's regular and repetitive medical requests (kites).

7.      Medical and jail staff ignored Plaintiff's prolonged and worsening conditions for weeks and months. After two months, the only responses Plaintiff received was, "you have been well educated" regarding her issues and staff refused to do anything further for her.

8.      Her symptoms included chronic prolonged constipation for months, loss of appetite, intense pain, distended abdomen, swollen extremities, water retention, and periodic restricted ambulation and movement.

9.      The attending doctor placed Plaintiff on a special diet, but medical and/or jail staff did not relay the prescription to the jail kitchen. Plaintiff was also prescribed over-the-counter treatments (Milk of Magnesia and MiraLAX) for constipation.

10.     Healthcare workers and jail staff ignored dosing instructions and ignored proper administration of Plaintiff's treatments. At one point, the jail "ran out" of MiraLAX despite MiraLAX being readily available at most public retail stores. Plaintiff did not receive her daily doses during the days the jail was "out" of MiraLAX.

11.     After weeks and months of being ignored, Plaintiff attempted crude self-treatment methods. She began to attempt to remove fecal matter from her rectum using her fingers and hands. This process was very humiliating and painful for Plaintiff.

12.     Records indicate that Plaintiff did not receive any medical treatment from December 5, 2018 through December 12th, 2018. On December 12th, the attending doctor ordered an abdominal x-ray on Plaintiff. That order was ignored by attending medical and jail staff.

13.     After months of being ignored, Plaintiff's constipation escalated to an emergency. On December 15, 2018, her abdomen became so hard and distended that jail staff were forced to rush Plaintiff to Castle Rock Adventist Hospital via a deputy's squad car.  Upon examination in the Emergency Department, the doctors determined that her small intestine and large intestine were impacted with fecal material and distended by twelve centimeters or 4.7 inches. Her large intestine was also rotated counterclockwise or "twisted" due to the prolonged compaction.

14.     The surgeon removed a 20.5cm x 9 cm segment of Plaintiff's cecum and ascending colon in continuity with a 4cm segment of her terminal ileum. The surgeon also removed two sections of her bowel. The sections were 3cm in and 4.5cm in length. According to the pathology report, the surgeon also removed Plaintiff's appendix.  In total, the surgeons removed approximately thirteen inches of Plaintiff's small and large intestines as well as her appendix.

15.     Post-surgery, Plaintiff was returned to the jail where staff ignored the surgeon's orders and refused and/or failed to return Plaintiff to the hospital for a post-

4

surgical follow up. Staff also ignored Plaintiff's concerns regarding the sanitation of her incision and bandages. She began experiencing pain and itching around her incision and a rash-like condition began developing in an around her surgical incision. Medical and jail staff changed Plaintiff's bandages and cleaned her incision only once every three or four days.

16.     The jail refused to administer any prescribed pain medications to Plaintiff post-surgery. Medical and jail staff forced Plaintiff to endure the pain of recovering from a major surgery without any treatments for her pain.

17.     Once Plaintiff's rash had progressed to the point that jail and medical staff could no longer ignore it, the jail administration decided to discharge Plaintiff early instead of providing her any further treatment. This was solely a cost-saving measure and decision for the jail.

18.     Plaintiff was forced to seek private treatment for the rash that developed while she was in jail.

19.     Plaintiff was received into the jail's custody as a "whole person." When the jail discharged her, she was missing thirteen inches of gastrointestinal tract, her appendix, and she was suffering from the pains from recovering from a major surgery, and an unknown rash-like condition that had developed in an around her incision from lack of sanitary care.

20.     Defendants' actions and failures to act are violative of Plaintiff's rights and privileges pursuant to the Constitution of the United States of America. Defendants'

actions and failures to act are the direct and proximate causes of the injuries to Plaintiff and are the direct violations of Plaintiff's rights and privileges.

21.     Plaintiff now brings this action pursuant to 42 U.S.C §§1983 and 1985 for events that occurred while she was in custody at the Douglas County Detention Center/Douglas County Jail, in Castle Rock, Colorado.

## II.     JURISDICTION AND VENUE

22.     This action arises under the Federal Constitution and the laws of the United States, including Article III, Section 1, and 42 U.S.C. §§ 1983 and 1985. The Jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§ 1331 and 1343.

23.     This case is instituted in the United States District Court  for the District of Colorado pursuant to 28 U.S.C. § 1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

24.     Supplemental pendent jurisdiction is based on 28 U.S.C. §1367 because violations of federal law alleged are substantial and the pendent cause of action derives from a common nucleus of operative facts.

25.     Venue is proper pursuant to 28 U.S.C. §1391(b).  All Defendants reside in the District of Colorado. Plaintiff's claims arose in the District of Colorado.

26.     This Court has jurisdiction over plaintiff's claims for payment of her attorney's fees, 42 U.S.C. §1988.

## III.   <u>PARTIES</u>

**<u>Plaintiff</u>**

27.     At all times pertinent hereto, Plaintiff was a resident of the State of Colorado and a citizen of the United States of America.

**<u>Defendants</u>**

28.     At all times pertinent hereto, Defendant, Board of County Commissioners, Douglas County and Douglas County Sheriff's Office, (hereafter "Douglas County"), were governmental entities chartered under the laws of the State of Colorado. Among other things, Douglas County, operates the Douglas County Detention Center/Douglas County Jail, (hereafter "the jail"). The jail is a jail that confines pre-trial detainees and convicted inmates. Douglas County implemented and executed official policy decisions made by its elected officials that determined policies of the jail.

29.     At all times pertinent hereto, Defendant, Tony Spurlock, was a citizen of the United States and a resident of the State of Colorado. He is the Sheriff of Douglas County, Colorado. At all times, he was acting under the color of state law in his capacity as Sherriff. Sheriff Spurlock is the final policy maker with respect to all matters concerning the Douglas County Sheriff's Office and all of its divisions, including the Douglas County Jail. At times, Sheriff Spurlock would delegate authority to the medical contractors for the jail, co-defendants in this matter.

30.     DCBOCC and the Douglas County Sheriff's Office are collectively referred to herein as "Douglas County" or "Douglas County Defendants."

31.     At all times pertinent hereto, Defendants Douglas County are public entities responsible for the jail and its policies. Defendants Douglas County are entities that may be proper defendants pursuant to 42 U.S.C. §§ 1983, 1985.

32.     At all times pertinent hereto, Defendant Southwest Correctional Medical Group, PLLC (hereafter, "SCMG, PLLC") is a private, for profit Texas Corporation that is registered to do business in Colorado, with a principal place of business at 2511 Garden Road, Suite A160, Monterey, CA 93940. Upon information and belief, this company contracts with Douglas County to provide medical services to inmates and detainees at the jail. SCMG supervises and implements such care at the jail with authorization from Douglas County, co-defendants in this matter.

33.     At all times pertinent hereto, Southwest Correctional Medical Group, Inc. (hereafter "SCMG, Inc.") was a private, for profit Delaware Corporation registered to do business in Colorado with a principal office street address of 3911 Sorrento Valley Boulevard, Suite 130, San Diego, California, 92130. Upon information and belief, this company contracts with Douglas County to provide medical services to inmates and detainees at the jail. SCMG, Inc. supervises and implements medical policies at the jail with authority from Douglas County, co-defendants in this matter.

34.     At all times pertinent hereto, Southwest Correctional Medical Group LLC, (hereafter "SCMG, LLC") was a private, for profit Delaware Corporation registered to do business in Colorado with the same principal place of business as Southwest Correctional Medical Group, PLLC. Upon information and belief, this company contracts

with Douglas County to provide medical services to inmates and detainees at the jail. SCMG, LLC supervises and implements such services.

35.     At all times pertinent hereto, Colorado Correctional Medical Group, PLLC (hereafter, "CCMG, PLLC") was incorporated in Colorado, with a principal place of business at 2511 Garden Road, Suite A160, Monterey, CA 93940. Upon information and belief, this company contracts with Douglas County to provide medical services to inmates and detainees at the jail. CCMD, PLLC supervises and implements such medical policies.

36.     At all times pertinent, Correctional Medical Group Companies Inc. (hereafter "CMGC"), is located in 12220 El Camino Real, Suite 310, San Diego, CA 92130, and is doing business in Colorado as Southwest Correctional Medical Group, LLC and/or as Southwest Correctional Medical Group, PLLC, and as Colorado Correctional Medical Group PLLC (hereinafter CMGC and SWCMG will be referred to as "CMGC"). CMGC advertises in Colorado as CMGC doing business as SWCMG. CMGC exerts control over SWCMG including control over its daily operations, hiring, training, staffing, and policies and procedures. CMGC decides whether inmates, including Plaintiff Malloy, are allowed to go to the hospital for additional medical care.

37.     Upon information and belief, CMGC contracts with Douglas County to provide medical services to inmates and detainees at the jail. CMGC supervises and implements such services.

38.     Defendant Southwest Correctional Medical Group, Inc., Southwest Correctional Medical Group, PLLC, Defendant Correctional Medical Group Companies

Inc., Defendant Southwest Correctional Medical Group LLC, and Defendant Colorado Correctional Medical Group, PLLC are corporate medical providers related to one another, and are collectively referred to "CMGC Entity Defendants." CMGC Entity Defendants are proper entities as defendants pursuant to claims arising under 42 U.S.C. §1983. They are proper defendants based on their deliberately indifferent policies, practices, habits, customs, procedures, training, and lack of supervision of staff, including individual Defendants, with respect to the provision of medical care and treatment for inmates with serious emergency medical needs.

39. At all relevant times, CMGC Entity Defendants were acting under the color of state law and performing a central function of the state thus making them liable under 42 U.S.C. § 1983. All of the conduct of the CMGC Entity Defendants and its employees and agents are also chargeable to the government, and CMGC Entity Defendants were acting jointly with government actors.

40. At all times pertinent hereto, Sophia Nix, LPN was a citizen of the United States and a resident of Colorado. Upon information and belief, Ms. Nix was employed by CMGC Entity Defendants.

41. At all times pertinent hereto, Nurse Jennifer Trimble was a citizen of the United States and a resident of Colorado. Upon information and belief, Ms. Trimble was employed by CMGC Entity Defendants.

42. At all times pertinent hereto, Nurse Nicole Horton was a citizen of the United States and a resident of Colorado. Upon information and belief, Nurse Nicole

Horton was acting under color of state law in her capacity as a Nurse employed by SWCMG Defendants.

43.    At all times pertinent hereto, Nurse Jamie Miller was a citizen of the United States and a resident of Colorado. Upon information and belief, Nurse Jamie Miller, was acting under color of state law in her capacity as a Nurse employed by SWCMG Defendants.

44.    At all times pertinent hereto, Shauri Kron, LPN was a citizen of the United States and a resident of Colorado. Upon information and belief, Ms. Kron, was employed by SWCMG Defendants.

45.    At all times pertinent hereto, Nurse Emily Barron, RN was a citizen of the United States and a resident of Colorado. Upon information and belief, Nurse Barron, was acting under color of state law in her capacity as a Nurse employed by SWCMG Defendants.

46.    At all times pertinent hereto, Shauna Shipps was a citizen of the United States and a resident of Colorado. Upon information and belief, Shauna Shipps, was employed by SWCMG Defendants.

47.    At all times pertinent hereto, Gina Braidman, PA was a citizen of the United States and a resident of Colorado. Upon information and belief, Gina Braidman, PA, was acting under color of state law in her capacity as a PA employed by SWCMG Defendants.

48.     At all times pertinent hereto, Melissa Hoskins was a citizen of the United States and a resident of Colorado. Upon information and belief, Ms.Hoskins was employed by CMGC Entity Defendants.

49.     At all times pertinent hereto, Nurse Joan Cunningham was a citizen of the United States and a resident of Colorado. Upon information and belief, Nurse Cunningham, was acting under color of state law in her capacity as a Nurse employed by SWCMG Defendants.

50.     At all times pertinent hereto, Kayla Sharpe was a citizen of the United States and a resident of Colorado. Upon information and belief, Ms. Sharpe was employed by CMGC Entity Defendants.

51.     At all times pertinent hereto, Nurse Jenna Walter was a citizen of the United States and a resident of Colorado. Upon information and belief, Nurse Walter, was acting under color of state law in her capacity as a Nurse employed by SWCMG Defendants.

52.     At all times pertinent hereto, Melodie Dieter was a citizen of the United States and a resident of Colorado. Upon information and belief, Ms. Dieter was employed by CMGC Entity Defendants.

53.     At all times pertinent hereto, Keith Penry was a citizen of the United States and a resident of Colorado. Upon information and belief, Mr. Penry was employed by CMGC Entity Defendants.

54.     At all times pertinent hereto, Officer Cheriti Sellers was a citizen of the United Sates and a resident of Colorado, employed by the Douglas County Sheriff's

Office, and was acting within the course and scope of that employment as an Officer and acting under the color of state law.

55.     At all times pertinent hereto, Nurse Alecia Casciotta was a citizen of the United States and a resident of Colorado. Upon information and belief, Nurse Casciotta, was acting under color of state law in her capacity as a Nurse employed by SWCMG Defendants.

56.     At all times pertinent hereto, Renea Berry was a citizen of the United States and a resident of Colorado. Upon information and belief, Ms. Berry was employed by CMGC Entity Defendants.

57.     At all times pertinent hereto, Tammy Garrett, PA was a citizen of the United States and a resident of Colorado. Upon information and belief, Tammy Garrett, PA, was acting under color of state law in her capacity as a PA employed by SWCMG Defendants.

58.     At all times pertinent hereto, Arthur Landry was a citizen of the United States and a resident of Colorado. Upon information and belief, Mr. Landry was employed by CMGC Entity Defendants.

59.     At all times pertinent hereto, Kevin Lesniewcz, EMT was a citizen of the United States and a resident of Colorado. Upon information and belief, Mr. Lesniewcz was employed by CMGC Entity Defendants.

60.     At all times pertinent hereto, Jessica Isaacs was a citizen of the United States and a resident of Colorado. Upon information and belief, Ms. Isaacs was employed by CMGC Entity Defendants.

61.     At all times pertinent hereto, Natalie Moravek was a citizen of the United States and a resident of Colorado. Upon information and belief, Ms. Moravek was employed by CMGC Entity Defendants.

62.     At all times pertinent hereto, Nurse Stephanie Russak was a citizen of the United States and a resident of Colorado. Upon information and belief, Nurse Russak was acting under color of state law in her capacity as a Nurse employed by SWCMG Defendants.

63.     At all times pertinent hereto, Timothy G. Moser, M.D. was a citizen of the United States and a resident of Colorado. Upon information and belief, Dr. Moser, was acting under color of state law in his capacity as a Doctor employed by SWCMG Defendants.

64.     At all times pertinent hereto, Nicole Beckett was a citizen of the United States and a resident of Colorado. Upon information and belief, Ms. Beckett was employed by CMGC Entity Defendants.

65.     At all times pertinent hereto, Jennifer Glenn was a citizen of the United States and a resident of Colorado. Upon information and belief, Ms. Glenn was employed by CMGC Entity Defendants.

66.     At all times pertinent hereto, Cheryl Johnson, NP was a citizen of the United States and a resident of Colorado. Upon information and belief, Ms. Johnson was employed by CMGC Entity Defendants.

67.     At all times pertinent hereto, Unidentified Nurse with initial "BR" was a citizen of the United States and a resident of Colorado. Upon information and belief, Nurse BR was employed by CMGC Entity Defendants.

68.     At all times pertinent hereto, Unidentified Pod Deputies, were citizens of the United Sates and residents of Colorado. The Deputies were employed by the Douglas County Sheriff's Office, and they were acting within the course and scope of that employment as Officers and acting under the color of state law.

69.     Defendants Jane Does, 1-10 and John Does 1-10 are currently unknown employees of Defendant Douglas County, Colorado, and/or the Douglas County Colorado Sheriff's Office, or they are non-employees acting on behalf or at the behest of Defendants Douglas County, Colorado and/or the Douglas County Colorado Sheriff's Office, in furtherance of violating Plaintiff's civil rights and/or inflicting other injuries upon her.

**Defendant Party Groups**

70.     The following defendants will be known as the Douglas County Defendants; Douglas County Sheriff's Office, Douglas County Sheriff, Tony Spurlock, Board of County Commissioners of the County of Douglas Colorado, and Officer Cheriti Sellers.

71.     The following defendants will be known as the Correctional Medical Group Companies (hereafter, "CMGC") Defendants; Correctional Medical Group Companies, Inc., Southwest Correctional Medical Group, Inc., Southwest Correctional Medical Group, LLC, Southwest Correctional Medical Group, PLLC, Colorado Correctional

Medical Group, PLLC, Dr. Timothy G. Moser, Nurse Jennifer Trimble, Sophia Nix, LPN,

Nurse Nicole Horton, Nurse Jamie Miller, Shauri Kron, LPN, Shauna Shipps, Gina

Braidman, PA, Melissa Hoskins, Nurse Emily Barron, Nurse Joan Cunningham, Kayla

Sharpe, Nurse Jenna Walter, Melodie Dieter, Keith Penry, Nurse Alecia Casciotta,

Renea Berry, Tammy Garrett, PA, Arthur Landry, Kevin Leniewcz, EMT, Jessica Isaacs,

Natalie Moravek, and Nurse Stephanie Russak.

### III.  <u>STATEMENT OF FACTS</u>

72.     The allegations in this section are all made upon information and belief.

The basis for these allegations comes from hospital records, kites, and records from

Douglas County.

73.     Plaintiff, Holly Vanluven-Malloy, was born August 22, 1970.

74.     In approximately August 2018, Plaintiff was placed in the custody of the

Douglas County Detention Center ("the jail").

75.     Plaintiff had a long history of medical issues including Parkinsons, chronic

alcoholism, chronic solvent abuse ("huffing"), and mental health issues.

76.     The jail and its staff were made aware of Plaintiff's medical issues upon

taking Plaintiff into custody.

77.     During her incarceration, she received or was prescribed to receive the

following prescription medications: Valium, fluoxetine, gabapentin, Latuda, mirtazapine,

nortriptyline, trazadone, and Buspar.

78.     Constipation is a known side effect of the following medications that

Plaintiff was being treated with while in the custody of the jail:

a.      Trazodone – constipation is a known common side effect of this drug. A high fiber diet, laxatives, and exercise are recommended to lessen constipation when taking this drug.

b.      Amantadine – accidental falls and constipation are known common side effects of this drug.

c.      Mirtazapine – constipation is a known common side effect of this drug.

d.      Nortriptyline – constipation is a known common side effect of this drug where a high fiber diet, laxatives, and regular exercise are recommended to ease constipation when taking this drug. When taken with other drugs with similar side effects the effect could become severe.

e.      Valium – Constipation is a known infrequent side effect of this drug.

f.      Fluoxetine (Prozac) – constipation is a known side effect and occurs infrequently. Recommended treatment by primary care physician or gastroenterologist if patient experience continuous or painful GI symptoms.

g.      Gabapentin – constipation is a known side effect and occurs infrequently. However, when taken in combination with other drugs for anxiety or sleep such as Valium, then the risk of serious side effects are increased.

79.     Seven of the nine medications that Plaintiff was prescribed and taking have constipation listed as a side effect. Four out of the seven of those medications

have constipation listed as a common side effect. Of those four, two, Amantadine and Trazodone, list constipation as a likely side effect and comes with special dietary and supplemental instructions to treat the likely constipation. The warnings on all of those medications indicate that side effects will be worsened if taken with drugs that have similar side effects.

80.     On August 6, 2018, Plaintiff met with Dr. Moser to discuss her health history. Dr. Moser became aware that Plaintiff suffers from Parkinson's disease, other medical issues, and some mental health issues. Plaintiff also expressed that she suffers from severe constipation.

81.     August 6, 2018, Dr. Moser prescribed Plaintiff Milk of Magnesia twice per day for thirty days.

82.     On August 11, 2018, Plaintiff reported "still having some problems" and requested a laxative, Dulcolax. On August 12, 2018, a person known, only as JW, denied Plaintiff's request telling her to drink the water she receives daily.

83.     On August 23, 2018, Plaintiff sent a communication requesting that someone make sure that her Milk of Magnesia be put on the cart. It had been left off of the medicine cart several times. On the same day, an unknown nurse responded that Plaintiff should speak to med-nurse in the morning.

84.     On August 24, 2018, Plaintiff reported being non-ambulatory and in severe pain. Four days later, Nicole Beckett, responded that Plaintiff should kite medical with these concerns and closed the communication as unfounded.

85.     On August 31, 2018, Plaintiff was experiencing episodes related to her Parkinson's disease. discussed her declining health with Shauna Shipps. Ms. Shipps met with Plaintiff in the "pod." Ms. Shipps reported Plaintiff as being on the floor shaking and confused. Concerned about a neurological issue. On September 1, Ms. Shipps noted that Plaintiff had lost control of bodily functions. Pod deputy, who is unknown, indicated that Plaintiff had urinated in her bed. 0 persons acting without medical authority changed this to Monday Wednesday Friday evening, as needed. Plaintiff was never treated by medical staff.

86.     On September 9, 2018, Plaintiff was examined by Dr. Moser. Dr. Moser authorized Tylenol, Amantadine, and Latuda. He ordered for Plaintiff magnesium hydroxide (Milk of Magnesia) (hereafter "MoM") at 400mg/5ml twice per day and discontinue nortriptyline.

87.     Contrarily, LPN Shauri Kron, ignored Dr. Moser's orders from September 9, 2018. On September 10, 2018, without authority, Nurse Kron changed Dr. Moser's orders of September 9, 2018. Nurse Kron ordered for Plaintiff MoM only as needed at bedtime on Mondays, Wednesdays, and Fridays. Thereby reducing Plaintiff's doses from fourteen times per week as ordered by Dr. Moser on September 9, 2018, to three times per week pursuant to an LPN Kron's order.  Dr. Moser would later approve the LPN's order on September 11, 2018.

88.     On September 18, 2018, an unknown pod deputy, contacted mental health stating that Plaintiff was confused, disoriented, difficulty breathing, and hands were visibly shaking with little muscle control.

89.     On September 20, 2018, Plaintiff was seen by Gina Braidman, PA to have Plaintiff transferred to Castle Rock Adventist Emergency Department. Diagnoses unknown.

90.     On September 25, 2018, Dr. Moser ordered for Plaintiff a snack of peanut butter and apples with every meal. This was reported to be for weight gain and fiber. The jail and medical staff sporadically followed these orders.

91.     On October 2, 2018, Plaintiff submitted a kite requesting constipation medicine twice per day. Neither medical nor jail staff had informed Plaintiff that LPN Kron changed her constipation treatment and medication. Two days later, Emily Barron responded that Plaintiff "ha[s] and appointment with medical." The kite was closed.

92.     On October 3, 2018, Nurse Joan Cunningham, received a call from and unknown officer in K-pod. The call was in reference to Plaintiff reporting having a GI bleed. Plaintiff reports she has not had a bowel movement in ten days. Nurse's notes seem to cast doubt on report. Tells Plaintiff that is she has bloody emesis that she should "save it."

93.     On October 4, 2018, at 3:38 p.m. requesting pain medications, and reporting that she has "not pooped in 10 days." She further reports that the nurses won't listen to her and no one in the jail is listening to her. She needs help getting [her poop] out.

94.     Five days later, on October 9, 2018, Jennifer Glenn, responds that Plaintiff has no medical necessity to for pain meds, she has received medication for bowel

movement, and explains that Plaintiff does not meet criteria to go to hospital. She ignores Plaintiff's report of not having a bowel movement for tent days.

95.     On October 4, 2018 at 8:14 p.m., Plaintiff entered a kite stating that she "was so constipated I can't sleep." She needed MoM twice per day. She was impacted. Please take her to hospital to have impact removed.

96.     On October 4, 2018, Plaintiff also notified jail and medical staff that she had begun self-treatment by "using my hands" to remove fecal matter from her rectum, but it was "painful."

97.     On October 6, 2018, the above described kite was closed by an unknown individual without response.  The kite was marked unfounded.

98.     On October 22, 2018, Plaintiff entered a kite seeking a consultation with Dr. Moser "asap" because she has extreme pain in ankles and feet and she is constipated. She requests more MoM. Plaintiff also reported that her order for apples and peanut butter was not being followed or had expired despite her reports of still being constipated. On October 23, 2018, a person known as "SN" responded that Plaintiff had been scheduled for "sick call." Kite was closed

99.     On October 24, 2018 Plaintiff submits a kite stating that she saw the doctor and that the apples and peanut butter had been ordered as well as coleslaw and beans. She also stated she was supposed to receive snack. Kitchen stated they had received no such orders. Dr. Moser ordered for Plaintiff that she was to receive an evening snack and peanut butter with every meal. That order was placed on September 25, 2018, but Plaintiff had not been receiving food as ordered. On October 25, 2018, an

unknown nurse responded that diet form was sent to kitchen regarding only apples and peanut butter.

100.    On October 25, 2018, Plaintiff reported that her digestive system was "all screwed up." She can't go "potty" and her stomach "looks like I'm pregnant." She also requested stool softener and gas pill. On same day, an unknow nurse responded stating that Plaintiff had already seen a medical provider and medications were appropriate.

101.    On October 27, 2018, Plaintiff entered a kite stating that her stomach is distended, constipated, and in "so much pain" and is demanding that something needs to be done. She states that her treatment is cruel and pleads for help. Ten hours later, LPN Sophia Nix responds that Plaintiff has been scheduled for a sick call, and Nurse Nix closes the kite.

102.    On October 28, 2018, Plaintiff entered a kite at 1:14 p.m. stating that she is not going to pay for a visit to the doctor. She is upset that medical staff have alleged that she has an eating disorder and that is why she is requesting laxatives. She stated again, as she did the previous day, that she is "in pain" and she can't "go potty." She states that the nurse was rude. Two days later, on October 30, 2018, Nurse Jennifer Glenn responds stating that a copay is charged to see medical providers. States that Plaintiff is receiving appropriate medications.

103.    On October 31, 2018, Plaintiff states she is "pissed as hell!" She again reports that she is constipated and in pain. Nobody will help her nor allow her to see the doctor. She reports she received only one-half of the dose of MoM instead of a full dose as ordered. Unknown dispensing nurse told Plaintiff he was only allowed to dispense

one-half dose. On the same day, an unknown nurse with initials BR responded with the exact same message from the October 30 kite, "if Plaintiff wants to see a medical provider, then she will be charged a copay."

104.    November 6, 2018 Plaintiff states she received the full ordered dose of MoM and she was able to have a bowel movement.

105.    November 11, 2018 Plaintiff entered a kite stating her constipation is adding to her stress levels because the pain "hurts so bad." "I have poop stuck in my behind, please help." On November 12, 2018, a person identified as "JW" responds that Plaintiff will not receive anything more for her constipation.

106.    On November 15, 2018, Plaintiff entered a kite stating, "I cannot take it any longer. I am in so much pain. I have not had a bowel movement in five days. You have to help me. I can't even sleep. I am hurting bad!" On same day, an unknown nurse responded, "you are receiving medication as ordered by medical provider. You have an appointment."

107.    On November 20. 2018, Plaintiff entered a kite stating she needed to see Dr. Moser. She had a bowel movement since the previous week's Monday, which was November 12. 2018. Stated she received MoM on November 19 but no bowel movements and in "so much pain." On same day, an unknown nurse responds, "you have been scheduled for a sick call."

108.    On November 21, 2018, Nurse Nicole Horton received approval from Dr. Moser to increase Plaintiff's MoM dose by one day, Saturday.

109.    On November 25, 2018, Plaintiff entered a kite informing staff that she had not had a bowel movement in seven days. Requests enema.  On November 26, a nurse with initials "JW" responds, "as you have been told multiple times before, you will not receive a laxative seven days a week." "The provider has only approved Monday night, Wednesday night, and Friday night. You have been placed on the sick call list for the nurse to assess if you are constipated."

110.    On December 5, 2018, Plaintiff entered a kite stating she had been waiting on MoM for over 24 hours. Plaintiff again reports nurse dispensing only one-half of dose prescribed. On the same day, an unknown nurse responds that Plaintiff has been educated on this multiple times. You also have a daily constipation pill that you take at night. Kite is closed.

111.    On December 10, 2018 at 8:47 p.m., Plaintiff entered a kite stating, "I am disabled. I have requested medical many times for a medical condition that I am having now with a serious bowel movement problem." She informs staff that it has been nine days since her last bowel movement. Also informs, "painful stomach hurts bad." "Haven't thrown up yet, but I need to." Please help!"  On December 12, 2018, Keith Penry responds, "we are in contact with our medical provider who knows your medical history. We will continue to work with you on your medical concerns." Kite closed.

112.    On December 12, 2018, Nurse Jamie Miller received orders from Dr. Moser to give Plaintiff an abdominal x-ray. On the same day, Nurse Miller notes that Plaintiff received abdominal x-ray. Nothing further was commented.

113.    On December 15, 2018 Plaintiff was examined in the jail medical unit by Nurse Jenna Walter. Nurse Walter reported that Plaintiff's stomach was "remarkably distended and hard to palpation." Plaintiff reported stabbing pain in abdomen. States that pain is radiating to her back.  Nurse Walter reported that bowel sounds are hypoactive in all quadrants. Plaintiff also reported no flatus and she was dry heaving.

114.    Nurse Walter attempted to provide hydration via IV, but attempt was unsuccessful. Plaintiff reported there had been no substantial bowel movement for nine days.

115.    Nurse Walter notified Castle Rock Adventist Hospital's Emergency Department. Staff there instructed nurse Walter to bring patient on.

116.    Upon examination in the Emergency Department, the doctors determined that her small intestine and large intestine were impacted with fecal material and distended by twelve centimeters or 4.7 inches. Her large intestine was also rotated counterclockwise or "twisted" due to the prolonged compaction.

117.    The surgeon removed a 20.5cm x 9 cm segment of Plaintiff's cecum and ascending colon in continuity with a 4cm segment of her terminal ileum. The surgeon also removed two sections of her bowel. The sections were 3cm in and 4.5cm in length. According to the pathology report, the surgeon also removed Plaintiff's appendix.  In total, the surgeons removed approximately thirteen inches of Plaintiff's small and large intestines as well as her appendix.

118.    Plaintiff was returned to custody of the jail on December 19, 2018.

119.    All members of the jail and medical staff ignored Plaintiff's pleas for help over a five-month period. During that period, Plaintiff submitted over fifty requests for help regarding the same or similar symptoms of pain and inability to evacuate her bowels.

120.    Defendants ignored the fact that their prescribed economical treatments were offering no relief nor solution to what is normally an easily treated condition, constipation.

121.    Defendants are trained professionals who know that constipation does not continue for five months with proper treatment. Plaintiffs knew and disregarded that Plaintiff was likely suffering from a more serious condition or they disregarded her as faking her symptoms and being misleading.

122.    Defendants knew that Plaintiff's condition was worse than they were acknowledging. An x-ray was ordered only when it had become too late for the Plaintiff and her body.

123.    Instead of offering compassion and treatment, Defendants ignored Plaintiff's bowel impaction and distention, intestinal rotation and twisting, and her collapsed bowel until it became life threatening for Plaintiff.

124.    The deliberate and wanton ignorance and indifference of jail and medical staff regarding Plaintiff's prolonged condition was a direct cause of Plaintiff's physical and emotional injuries. Such actions and inactions were clear violations of the Plaintiff's rights pursuant to the Eight and Fourteenth Amendments of the United States Constitution.

125.   However, Defendants violations did not cease upon Plaintiff's return from surgery.

126.   On December 23, 2018, Plaintiff enters a kite stating that she has not had a bowel movement since she was returned from the hospital. She asked that the issue be addressed before she gets sick again. On December 24, 2018, a person known only by initials "SN" responds, "you've been scheduled for sick call." Kite was closed.

127.   On December 26, 2018 Plaintiff enters a kite stating that it has been seven days and she has not been to the bathroom. She states she is in pain. She tells staff they need to resolve the issue before another problem occurs. On December 27, 2018, a person known only by initials "SN" responds, you have been scheduled for a sick call. Kite closed

128.   On December 27, 2918, Plaintiff entered a kite stating that she has been taken off of her pain medications. She has not had her staples taken out. She requested her pain meds. On the same day, a person known only by initials "SN" responded by stating that Plaintiff was not taken off of her pain meds. She told Plaintiff she had been given the medications as prescribed. Staples will be removed when appropriate. Provider will be asked about additional pain medications.

129.   Plaintiff also reports that jail and medical staff ignored Plaintiff's verbal requests and concerns regarding the sanitation of her incision and bandages. She began experiencing pain and itching around her incision and a rash-like condition began developing in an around her surgical incision. Medical and jail staff changed Plaintiff's bandages and cleaned her incision only once every three or four days.

130.    On December 27, 2018 Nurse Nicole Horton noted hypoactive bowel sounds in Plaintiff.

131.    On December 28, 2018, Tammy Garrett, PA removed Plaintiff's staples despite being ordered to return for a follow-up visit by Plaintiff's surgeon.

132.    Contrary to surgeon's orders, neither jail staff nor medical staff at the jail transported Plaintiff back to the hospital for her post-surgery follow up and exam with

133.    On January 1, 2019, Plaintiff entered a kite informing staff that she had not received her MoM nor MiraLax that morning. She requested anything for her constipation. She was in obvious fear that the medical and jail staff were going to allow her to become severely constipated again. Thirteen hours later, an unknown nurse responded, "you received the MiraLax tonight."  Nurse failed to address the missed doses of MoM and MiraLax.

134.    On January 4, 2019, Plaintiff entered a kite stating that she was "pissed." She was told that she could not have her morning does of MoM. She stated she was informed that her prescription/order had expired. Stated she was sick of "fighting for this" her medications that she was prescribed. On January 5, 2019, a nurse known only by the initials "SN" responded, "your medication was actually expired." "It has been renewed and will be available to you tomorrow." Kite closed.

135.    On January 10, 2019, Plaintiff reported to Nurse Nicole Horton that she tripped over her shackles and hit her stomach on the court bench. It was very painful on the upper part of her surgical scar and lower quadrant. Per an unknown pod deputy, the

video was reviewed, and Plaintiff could not be observed hitting any part of her body on the bench. She caught herself with her hands according to the deputy.

136.    On February 8, 2019, Plaintiff entered a kite requesting more MoM. She stated she was getting two doses of MoM each morning and two doses of MiraLax at night. The combination was working. She requested that it be continued. On February 8, 2019, a person known only by the initials "SN' responded that the provider was consulted and approved Plaintiff's request.

137.    On February 14, 2019, Plaintiff entered a kite stating that she has not received MiraLax for her last three doses and that she had not been "potty" in three days. She requested an alternative. States she was informed that the jail ran out of MiraLax. On February 15, 2019, a nurse known only by the initials "JP" responded that it looks as though Plaintiff received medication during the p.m. med pass. Closed the kite.

138.    February 18, Plaintiff's Miralax was discontinued by a jail nurse.

139.    Plaintiff also reports that jail and medical staff ignored Plaintiff's verbal requests and concerns regarding the sanitation of her incision and bandages. She began experiencing pain and itching around her incision and a rash-like condition began developing in an around her surgical incision. Medical and jail staff changed Plaintiff's bandages and cleaned her incision only once every three or four days.

140.    On or about February 21, 2019, the jail discharged Plaintiff early. She was still suffering from the rash/infection from the medical staff's failure to properly change her bandages. She was forced to seek private care from a local physician. As of this filing, the relevant medical records have not been obtained.

141.    Defendant's continued to violate Plaintiffs rights until the day she was discharged, and the injuries she suffered continued beyond discharge and will continue for the rest of Plaintiff's natural life.

142.    Defendant's patterns of practice and collaborations with one another are regular and ongoing. Defendant's actions are similar in three current cases that have been brough and are before this Court, *Kevin Hartwell et al, v. Correctional Medical Group Companies, Inc. et al*, 1:17-cv-02278-RBJ, *Benjamin Ramsey et al. v. Southwest Correctional Medical Group, Inc. et al*, 1:18-cv-01845-WJM-KLM, and this case. Defendants both individually and entities are mostly the same in all three cases.

143.    Douglas County Defendants and CMGC Entity Defendants knowingly and willingly maintained a pattern of practice of systemic deficiencies and indifferences regarding the care and treatment of inmates with serious medical conditions including allowing chronic serious conditions to go ignored and/or disregarded for months in order to avoid bad ratings and budget expenditures. Such conditions include Plaintiff's bowel impaction and distention, intestinal rotation and twisting, and her collapsed bowel.

144.    Defendants were all aware that a successful lawsuit can mean financial consequences as well as public relations and reputations consequences.

145.    Douglas County Detention Center maintains accreditation with the American Correctional Association (ACA) and National Commission of Correctional Health Care (NCCHC).

146.    Defendants derive benefits from Douglas County maintaining its accreditation with ACA and NCCHC. Such accreditation requires self-reporting of serious medical incidents and emergency room transfers, and statistics of safety.

147.    Defendants conspired and developed a policy and practice of keeping medical incidents, such as Plaintiff's, a secret from their accrediting agencies so that Defendants my maintain their accreditation.

148.    Defendants further conspired regarding Plaintiff and her treatments in attempts to keep budgetary costs as low as possible while attempting to appear to be providing adequate and proper care to inmates such as Plaintiff.

149.    As a result of her injuries, Plaintiff was damaged in the following manners:

a.      Non-economic damages including current, past, and future mental anguish, humiliation, current, past, and future pain, loss of enjoyment of life, fear, and emotional distress;

b.      Future medical treatment for injuries including the likelihood of a personal colostomy container;

c.      Permanent injuries including permanent disfigurement.

**IV.    CLIAMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. §1983 – Violation of the Eighth and Fourteenth Amendments**
**Failure to Provide Medical Care and Treatment**
**Deliberate Indifference**
**(Against Douglas County, Sheriff Spurlock, and Correctional Medical Group Defendants)**

150.    Plaintiff realleges and incorporates by reference the above paragraphs of this Complaint as is fully set forth herein.

151.    At all times relevant to the allegations herein, Defendants were acting under color of state law.

152.    Plaintiff Malloy was a citizen of the United States and all of the individual Defendants are persons pursuant to 42. U.S.C. § 1983.

153.    Plaintiff had clearly established rights pursuant to the Eighth and Fourteenth Amendments of the Constitution of the United States of America. Plaintiff's rights include the right to be free from suffering deliberate indifference by individuals controlling custody of the Plaintiff and her medical treatments regarding her serious medical conditions.

154.    Plaintiff is further entitled to the right to medical treatments that rise to the normal level of medical care and treatment within local community standards.

155.    Upon her entrance of custody into the Douglas County Detention Center/Jail, the supervising physician for CMGC Entity Defendants, conducted a thorough intake interview with Plaintiff where she disclosed all of her medical history including current medications.

156.    At all times relevant to the allegations herein, each individual Defendant knew of and disregarded the excessive risks associated with Plaintiff's prolonged serious medical condition.

157.    Defendants were trained professionals who were aware of Plaintiff's rights and the medications that she was taking.

158.    Defendants were trained professionals who were aware of the known side effects of the medications that Plaintiff was prescribed and taking. Defendants, as professionals, were aware or should have been aware that constipation was a <u>common-known</u> side effect to most of Plaintiff's medications.

159.    Defendants knew that stacking medications with common side effects would compound the side effects and severity thereof.

160.    Defendants, with deliberate indifference, ignored the fact that Plaintiff's symptoms continued for approximately five months.

161.    Plaintiff notified Defendants over fifty times that her symptoms continued despite some treatment and that her pain continued. Plaintiff pleaded for medical assistance from Defendants yet Defendants ignored requests, violating Plaintiff's rights, by closing her kites, stating she was receiving medicine she was prescribed, or stating a myriads of other excuses to avoid treating her symptoms and processing her kites.

162.    Defendants deliberate indifference denied Plaintiff equal treatment, subjected her to cruel and unusual punishment including unnecessary pain and humiliation.

163.    Inmates such as Plaintiff are not able to provide medical treatment for themselves. They must depend on their custodians to provide such treatment. Yet, Defendants' refusal and indifference regarding Plaintiff's medical care forced her to attempt to self-treat by attempting to dig impacted feces out of her rectum with her hands and fingers. This process was inhuman, degrading, humiliating, painful, and goes

beyond all bounds of decency. Defendants' deliberate indifference regarding Plaintiff's serious medical condition was the direct cause of these injuries.

164.    All of the deliberate and indifferent acts of each individual Defendant were conducted within the scope of his/her official duties and employment.

165.    The acts and omissions of each individual Defendant were the legal and proximate cause of Plaintiff's injuries and permanent impairments.

166.    The acts and omissions of each individual Defendant caused Plaintiff's damages in that she suffered extreme physical and mental pain while in Defendants' care and custody.

167.    The intention actions or inactions of each individual Defendant as described herein intentionally deprived Plaintiff of due process, equal protections, and of rights, privileges, liberties, and immunities secured for her by the Constitution of the United States of America.

168.    At all times relevant, Defendants had a legal duty to provide to inmates medical care within the standard of care for the community. Defendants violated their duty to Plaintiff by knowingly and purposefully denying Plaintiff medical care and treatment for her serious medical needs including her impacted intestines, rotated large intestine, and collapsed bowel.

169.    The stacking of prescription medications with known common side effects and the indifference of jail and medical staff regarding Plaintiff's long-term symptoms were the proximate and primary causes of Plaintiff's injuries.

170.     The Nurse Defendants failed to fulfill their gatekeeper roles by failing to notify the attending physician of Plaintiff's serious ongoing medical issues and by failing to send Plaintiff to the hospital prior to December 15, 2018 for her long-term complaints regarding GI issues.

171.     Instead, RNs and LPNs would diagnose Plaintiff, change, cancel, ignore, or modify the treating physician's orders so that they could remain on budget or maintain a schedule. Instead of gatekeeping, nurses were practicing medicine without a license while.

172.     Each Defendant's conduct was a direct cause of Plaintiff's injuries and damages which are indivisible. Liability is joint and several.

173.     Defendants' conduct occurred within the scope and during the course of their official duties and employment.  At all pertinent times, Defendants acted under color of state and/or federal law.

**SECOND CLAIM FOR RELIEF**
**42 USC §1983 Violation of Eight and Fourteenth Amendments**
**Douglas County and Douglas County Sheriff's Office:**
**Unconstitutional Policies**

174.     Plaintiffs reallege and incorporate by reference the above paragraphs of this Complaint as if fully set forth herein.

175.     Defendant Spurlock is a person within the meaning of 42 U.S.C. § 1983.

176.     Douglas County Defendants and CMGC Entity Defendants are persons within the meaning of 42 U.S.C. § 1983.

177.    At all times pertinent hereto, Defendant Spurlock and Douglas County Defendants were acting under color of state law and had a non-delegable duty to provide constitutionally adequate medical care for inmates.

178.    At all times relevant to the allegations in this Complaint, CMGC Entity Defendants were willful participants in a joint activity and acting under color of state law, as the legal and functional equivalent of a municipality providing medical care to inmates.

179.    The intentional acts or omissions of Defendant Spurlock, Douglas County Defendants, and CMGC Entity Defendants were conducted within the scope of their official duties and employment.

180.    CMGC Entity Defendants' and Douglas County Defendants' deliberately indifferent and unconstitutional policies, customs, and/or practices regarding medical care, post-surgical care, lack of provisions of constitutionally adequate medical care as described herein were the moving and proximate cause of Plaintiff's injuries and permanent disfigurement and injury.

181.    Defendants had an unofficial policy that was the moving force behind Plaintiff's injuries.

182.    Defendants policy or custom that caused Plaintiff's injuries included knowingly denying acknowledgment of a greater injuries or medical issues, not providing more expensive but necessary medications, allowing unauthorized staff to practice medicine in order to treat the serious medical conditions of the inmates.

183.   Defendants did not communicate the actual medical needs and all symptoms with the Medical Director.

184.   In order to cut costs, Defendants did not have a system to stock the medications needed to treat Plaintiff. This is obvious considering the jail "ran out" of a medication that is readily available at nearly every retail store.

185.   Defendants simply wrote down the names of the medications that were needed on a white board, and when they were out, the inmates were deprived of the medications they needed.

186.   CGMC Entity Defendants, Douglas County Defendants and Defendant Spurlock deliberately and indifferently failed to properly train and supervise their employees to provide necessary medical care to detainees at the jail.

187.   The failures in training, supervision, and policy regarding providing necessary medical assessment and care was so obvious that the failure to provide the same was deliberately indifferent to the rights of the inmates.

188.   CMGC Entity Defendants, Douglas County Defendants' and Defendant Spurlock's deliberately indifferent customs and failures to train/supervise are all actionable policy decisions that were moving forces and proximate causes of the violation of Plaintiff's constitutional rights.

189.   The policies, customs, and practices of CMGC Entity Defendants, Douglas County Defendants and Defendant Spurlock as described herein were also moving forces in and proximate causes of the deprivation of Plaintiff's right to due process and of the rights, privileges, liberties, and immunities secured by the Constitution of the

United States of America. Their policies, customs, and practices caused Plaintiff other damages.

190.   The County is also directly liable for its own policies and actions that are moving forces in this constitutional injury under the contract between Douglas County and private Defendants because the County was the entity that participated in negotiating and sponsoring this contract despite the knowledge of CMGC's pervasive pattern of civil rights violations.

191.   CMGC and/or Douglas County ("Defendants") ordered, ratified, or knowingly acquiesced in having nurses, perform constitutionally deficient initial health assessments of inmates, including but not limited to an assessment of Plaintiff Ramsey that, inter alia, failed to determine which post-operative brain surgery medication and seizure medications Plaintiff Ramsey was supposed to be taking for his noted conditions, which poses an obvious substantial risk of serious harm or death.

192.   Upon belief, Defendant Nurses may not have contacted a physician as required.

193.   Upon belief, since Plaintiff was not given her prescribed doses nor proper medications at the outset leading to Plaintiff's worsening condition, either Defendant Nurses did not receive proper training, supervision, and/or oversight, or there was an unconstitutional policy or custom requiring and/or knowingly acquiescing in allowing nurses to conduct constitutionally-inadequate diagnoses and examinations that lead to the denial of necessary medical treatment for serious medical needs, and that pose an obvious substantial risk of serious harm.

194.    Upon information and belief, Defendants had a policy or custom of routinely denying detainees, including Plaintiff, access to medical treatment by qualified medical providers, requiring nurses to practice outside the scope of their licenses by failing to fulfill their gatekeeper roles, and denying detainees necessary and life-saving medications and treatments.

195.    There are systemic and widespread deficiencies by multiple providers in the medical care and treatment by CMGC at the jail which reflect an official policy or custom of deliberate indifference to serious medical needs. The deficiencies were the moving force behind Plaintiff's injuries.

196.    The jail has an existing and ongoing need for training, supervision, and adequate staffing of the medical department so as to avoid the risk of serious injury and death of the inmates from life threatening illnesses.

197.    Based on information and belief, CMGC Entity Defendants and Douglas County purposefully failed to adequately staff, train, and/or supervise employees who so that they may provide detainees,  including Plaintiff, with access to medical treatment by a qualified medical provider for serious medical needs and that pose a substantial risk of serious harm. All of such failures were the moving force in causing Plaintiff's injuries and damages.

198.    Upon information and belief, CMGC requires that SWCMG use its management program to reduce unnecessary off-site care by ensuring the Chief Medical Officer for CMGC "reviews all off-site medical transports to enhance care and reduces unnecessary off-site medical transports." CGMC has many facilities in many

states that all have to contact the CGMC Chief Medical Officer prior to transport, no matter how emergent the need for transport. Douglas County knew and approved of the unconstitutional policy requiring use of a CMGC "management program" that requires nurses to practice outside the scope of their licenses and fail to fulfill their gatekeeper roles in a timely manner.

199.    Douglas County knew CMGC Entity Defendants would operate under this model when it signed a contract with CMGC, and the County was deliberately indifferent to the obvious risk of serious harm to its inmates including Plaintiff.

200.    Upon belief, Douglas County maintained a policy that it would not reimburse CMGC Entity Defendants for Emergency Room transfers, or prescribed medications. These policies systematically discouraged Emergency Room transfers and consistent medication administration, and this was foreseeable to Douglas County.

201.    Douglas County purposefully ignored the obvious risk that CMGC Entity Defendants would avoid costs to itself and its shareholders. CMGC's dangerous cost-saving measures would include avoiding costs associated with prophylactic administration of medications or emergency transfers, and it would instead be incentivized to gamble with citizens' lives by prioritizing profit over adequate care compared to risk when dealing with an unpopular and disadvantaged group. inmates.

202.    An investigative grand jury was convened in California to complete a thorough investigation of these same policies, as implemented between a California jail and CMGC's California counterpart CFMG (the same company prior to CMGC expanding to Colorado). On June 8, 2016 the Grand Jury concluded that a contract

requiring CFMG to pay all hospital emergency medical costs up to $15,000 per inmate for each medical/surgical inpatient episode was a disincentive to admit inmates to a hospital for necessary medical treatment, and removing the clause would foreseeably save lives. The Grand Jury's report was publicized.

203.    Douglas County is aware of the Grand Jury's report regarding its jail's healthcare provider's parent company.

204.    The Defendants maintained, enforced, tolerated, ratified, permitted, acquiesced in, and/or applied an unconstitutional policy or custom of denying detainees, including Plaintiff Ramsey's access to medical care and treatment by a qualified medical provider for serious medical needs. The deficiencies were so widespread and ubiquitous as to affect all inmates with serious medical needs at DCDF.

205.    Access to medical care for serious medical needs constitutes a usual and recurring situation with which officers and medical staff must deal, and for which it is necessary they receive training, supervision, and oversight. The need for more or different training, discipline, and supervision was so obvious and the inadequacy so likely to result in a violation of constitutional rights, that the policy makers of Douglas County and CMGC can reasonably be said to have been deliberately indifferent to the need.

206.    The inadequate training, inadequate discipline, and inadequate supervision, demonstrated a deliberate indifference on the part of the Defendants towards inmates.

207.    Defendants had a policy, custom, and practice of allowing or requiring nurses and/or medical providers to purposefully and deliberately deny detainees, including Plaintiff, medications and access to a qualified medical provider for necessary medical care and treatment for serious medical conditions, thereby creating an atmosphere where such behavior was accepted, approved, and ratified, in reckless disregard and deliberate indifference to the health and welfare of persons taken into custody, including Plaintiff.

208.    Douglas County had a non-delegable duty to provide detainees, including Plaintiff, with necessary medical care and treatment from qualified medical providers that meets a community standard of care. To the extent Douglas County delegated authority to make decisions to CMGC, either expressly or by default, the policies and customs of CMGC become the policies and customs of the County, and the County is liable for their actions if the policy proves unconstitutional.

209.    There was a direct causal link between the constitutional deprivations stated herein and the inadequate training, inadequate discipline and inadequate supervision and/or unconstitutional policies or customs of the Defendants.

210.    Each Defendant's conduct was a direct cause of Plaintiff's injuries and damages, which are indivisible, resulting in joint and several liability.

211.    The Defendants' unconstitutional conduct caused Plaintiff's injuries and damages set forth above in an amount to be proved at the time of trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment for the Plaintiff and against the Defendants and asks this Court to award her all of the relief allowed by law, including but not limited to the following:

A.      Appropriate relief at law and equity;

B.      Declaratory relief and other appropriate equitable relief;

C.      Economic losses on all claims allowed by law;

D.      All available compensatory damages, including but not limited to, all available damages for pain and suffering, physical injury, mental and emotional distress, humiliation, loss of enjoyment of life, and all other non-economic and economic damages available under the law;

E.      Punitive damages on all federal claims as allowed by law and in an amount to be determined at trial against all individual defendants, entities, and corporate Defendants;

F.      Attorneys' fees and costs associated with this action including expert witness fees, costs, and other expenses:

G.      Pre-judgment and post-judgment interests as appropriate; and

H.      Any further relief at law or equity that this Court deems just and proper.

**PLAINTIFF RESPECTFULLY REQUESTS TRIAL BY JURY.**

Respectfully submitted this 26th day of October, 2020

/s/ Todd Collins
Todd Collins
Marc Tull (Of Counsel)
Law Offices of Todd Collins
724 E Kiowa Ave Ste 7
PO Box 456
Elizabeth, CO 80107
Phone: (303) 588-2200
Fax: (800) 787-9516
Email: tcollins@tcollinsatlaw.com
         marc@tcollinsatlaw.com
**Attorneys for Plaintiff**